## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| STACY BARRETT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **Case No. 3:22-cv-02449-GCS** |
| ) | |
| TEAM INDUSTRIAL SERVICES, INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |

### MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

#### INTRODUCTION AND BACKGROUND

Before the Court is Defendant Team Industrial Services, Inc.'s motion for summary judgment (Doc. 39, 40, 54). Plaintiff opposes the motion. (Doc. 48, 49, 50). Based on the delineated reasons, the Court **GRANTS** the motion.

On October 21, 2022, Plaintiff Stacy Barrett sued her former employer, Defendant TEAM Industrial Services, Inc. ("TEAM") for sexual harassment pursuant to Title VII of the Civil Rights Act of 1964, including 42 U.S.C. § 2000e-2(a)(1). (Doc. 1). Plaintiff alleges that Defendant, through its manager, Chad Higgins, and other employees, intentionally harassed Plaintiff and created a hostile work environment for Plaintiff because of her sex. Prior to filing suit, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 15, 2018. (Doc. 1, p. 4). Attached to her complaint is Plaintiff's Conciliation Failure and Notice of Rights from the EEOC issued on

September 27, 2022 (Doc. 1-1). Defendant answered the complaint on December 22, 2022. (Doc. 11).

FACTS[1]

TEAM is an industrial service company offering an array of specialized services related to construction, maintenance, and monitoring of pressurized piping and associated systems. It also serves customers in the refining, petrochemical, power, pipeline, and other heavy industrial services.

Stacy ("Barrett") and Terry ("Terry") Barrett are husband and wife and have been married for about 16 years. Terry began working at TEAM in 2005. Terry voluntarily stopped working for TEAM in 2019 because he felt his wife was poorly treated. Terry was never subjected to harassment or bullying of any kind by any of TEAM's employees. Currently, Terry works for Granite City Steel.

Barrett was working as the manager of a bar and restaurant at the South Roxana American Legion when Defendant approached her and offered her a job. On February 22, 2008, TEAM hired Barrett as a helper/beginner technician in its Wood River, Illinois district. She had no experience as a technician before she was hired by TEAM. Barrett progressed into the role of Heat Treat Technician shortly after she was hired.[2] As a heat treat certified technician, Barrett was qualified to run jobs and could have two to twenty

---

[1]     Most of the facts have been agreed to by the parties, with some of the facts taken from Plaintiff's deposition.

[2]     Barrett started at TEAM in a "fire watch" position, then as a technician in training, and then a Level 1 technician. After two and a half years, she became lead technician.

people working underneath her. Barrett's primary job duties as a Heat Treat Technician included running cables, making thermocouples, precutting insulation, climbing and pulling heat treat cable, lifting and carrying equipment, completing paperwork associated with the job, monitoring the heat treatment cycles, and stripping and cleaning up job sites. There were about 60 heat treat certified technicians based out of the Wood River location.

During her employment, Barrett worked mostly at the Phillips 66 Refinery in Wood River as a technician and, on many occasions, TEAM assigned her to work on Turn around Projects (short duration, intensive work) near the Wood River location. At times, TEAM assigned Barrett and Terry to out-of-state projects together, with Barrett sometimes serving as the Project Manager. Barrett and Terry often worked together until Terry's back injury.

Barrett, through her and her husband's affidavits, averred that the harassment began in 2008 with two employees tearing up her work sheets and calling the corporate office with complaints about her. (Doc. 48-2, 48-3).

Barrett and Terry worked with Chad Higgins ("Higgins"), first when Higgins was a technician, and later when TEAM elevated Higgins to Operations Manager at the Wood River location. Barrett began having issues with Higgins in 2012. In 2012, Barrett and Terry were working on an out-of-state project in Tennessee, with Barrett as the lead technician and Higgins as a technician.  During this time, Barrett testified that a "blowup" with Higgins began when an unnamed coworker told Higgins that Barrett said Higgins needed to be watched. In response, Higgins screamed at Barrett, told her she was "a no[-] good piece of shit," that she did not deserve her job, and called her a "stupid fat bitch" in front

of the whole unit. Higgins screamed at her and told her she did not deserve her job and that he would not care if she died. After this 2012 project in Tennessee, Barrett went about five years without working with Higgins.

Barrett also stated that in 2016 while working a job for Boeing in Wichita, Kansas, TEAM's account manager for Boeing told her that she was not in charge of anything, that she could not run a job even if she had a brain, and that women do not belong in the workplace. (Doc. 48-2).

In 2017, Barrett and her husband returned to working primarily at the Phillips 66 Refinery in Wood River, where Higgins then served as the Operations Manager. Higgins was Barrett's direct supervisor. In September 2017, Barrett and her husband accidentally "butt-dialed" Higgins and left a disparaging voicemail about Higgins and other TEAM managers.

Barrett alleges Higgins would say insulting and negative comments about her to her co-workers and that Higgins called her stupid to her face on numerous occasions. In addition to the comments Higgins allegedly made to Barrett's co-workers, Barrett alleges Higgins instructed Helpers, both male and female, not to offer her as much assistance. She additionally alleges that Higgins assigned her jobs that were too difficult because they involved heights (to which she has an aversion). Higgins also did not assign her enough jobs out in the field. Barrett testified that TEAM accommodated her fear of heights "when they could." Further, Barrett testified that she was good at watching computers.[3]

---

[3]     The following colloquy took place:
        Q. I see. Okay. Back with Chad was saying back on Page 3 when he talks about -- when you

Also, Higgins took Barrett off a big turnaround job.[4] Higgins called every day to

_____

guys were talking about running computers and whatnot. So would you agree that for some jobs, having you watch computers is appropriate?

A. Yes.

Q. And then you talk about is that what you felt you were best at?

A. On some jobs, yes.

Q. So sometimes it would make sense for Chad to staff you in that role?

A. Yes.

(Doc. 40-2, p. 57-58; Doc. 48-1, p. 85-86).

[4]      As to this, Barrett testified:

Q. All right. And then you said you were taken off jobs. Can you be more specific? So when were you taken off jobs and who took you off those jobs?

A. So my husband and I were talking, we were sitting in a restaurant talking, and I accidentally butt dialed Chad Higgins. And I didn't -- the way that they were doing things was not correct. And my husband said, don't be like them, do your job the way you know how to do it. That affected the rest of my career.

Q. All right. And I have the voice mail. We'll play it and talk about it here in a minute. So as far as being taken off the jobs though -- my question was, though, who was -- who took you off the jobs and when?

A. Chad Higgins did.

Q. And when?

A. Right before they started. I don't have exact dates. But there was a big turnaround and I was supposed to do. He took me off it. And I didn't get work because of that. And then a couple weeks after that, he put me on another job and was calling every day to make sure I was working, that I wasn't just sitting. Which I never sat, I always worked.

Q. So do you believe Chad Higgins took you off the jobs because of the voice mail that you left him?

A. I absolutely do.

Q. All right. Do you think that there was any other reason that he took you off those jobs?

A. Chad didn't want me there. Chad wanted me gone.

Q. And what makes you say that?

A. When my husband and I come back to this office, Chad rallied everyone that was on the job site to try to quit if this office brought us back.

Q. All right. And what forms your foundation for that belief?

A. They told me.

Q. The people at the job site?

. . .

Q. According to these techs, Chad didn't want you or your husband there?

A. No. Because we were lead techs and we had been with the company longer so we had seniority. It was all about seniority.

Q. Seniority over who?

A. All of them. Because we had been with the company longer than everybody. And the company went by seniority.

make sure Barrett was working and not just sitting. Higgins took away the truck Terry

drove and gave Barrett a different truck, that according to Barrett, barely made it down

the road. TEAM permitted newly hired females to sit in the trucks and do nothing while

Barrett worked. These employees were told not to help her. (Doc. 40-2, p. 21; Doc. 48-1, p.

39). Barrett testified that Higgins began treating her worse around the time her husband

went off work due to a work injury.[5]

Matthew Thaxton heard Higgins downgrade Barrett behind her back.[6]

_____

Q. But you wouldn't have -- you would have had seniority over Chad?
A. No. Well, at that time, he wasn't a manager.
Q. Thank you. Got it. Okay. So at that time --
A. He was a technician.
Q. Thank you.

(Doc. 40-2, p. 17-20; Doc. 48-1, p. 35-38).

[5]     Specifically, Barrett testified:
Q. All right. And do you believe that those decisions to pull you off those jobs -- those were related to your husband's alleged work injury in addition to the butt dial?
A. It was the butt dial.
Q. All right. You mention your husband's work injury too. Do you think that impacted the way you were treated at TEAM?
A. It definitely did.
Q. By whom?
A. By all of them because he wasn't there to protect me.
Q. Oh, I see.
A. When he was there, none of this stuff -- I mean, it still happened, but it wasn't as bad. Once he was off work for that year having his back surgery, that's when things got really bad.

(Doc. 40-2, p. 72-73; Doc. 48-1, p. 114-115).

[6]     Matthew Thaxton averred in part: "Mr. Chad Higgins was the Operations Manager, level 3. Mr. Higgins was 'moody'. Somedays Mr. Higgins was pleasant to work with, however, more often he was difficult to work for. If any employee was not in his "click" (favorites), he was more difficult to work for.

Approximately one to one and a half ( 1 ½ ) years ago, Mr. Higgins advised me that he was going to assign Ms. Barrett difficult jobs knowing she could not perform them. He further stated the

In September 2017, Barrett reported Higgins's conduct to Jeff Gaines, the former branch manager. Mr. Gaines told Barrett he would take care of it.

In January 2018, Barrett alleges that she had a mental breakdown and went on short-term disability, which began on January 18, 2018. That same day Barrett turned in a letter of resignation to Richard Allen, TEAM Account Manager. The following day, Mr. Allen asked Barrett if she would be willing to meet with Joe Bowers, TEAM Area Senior VP, about her resignation, and Barrett agreed.

At the meeting with Mr. Bowers, Barrett claims that Mr. Bowers told her that he did not want to lose her because of a situation with Higgins and that he would take care of the problem. After the meeting, Barrett returned to work sporadically for a few days in January and February 2018 before going on indefinite leave on February 24, 2018. Barrett did not experience any negative incidents when she returned to work in January and February 2018 following her meeting with Mr. Bowers. The last comment Barrett heard was in 2018, right before she left, and the last time she heard a comment from an employee

---

reason he was assigning Ms. Barrett difficult jobs is because he knew that she couldn't do the job and that would give him reason to fire Ms. Barrett.

On one occasion, Mr. Higgins called Ms. Barrett as, 'a fat no good lazy cunt.' Mr. Higgins constantly downgraded Ms. Barrett behind her back. He repeatedly stated he was going to assign her more difficult jobs knowing she would fail to adequately complete the job. Mr. Higgins continued to make these types of assignments so that he would have grounds to fire Ms. Barrett.

It was very apparent that Mr. Higgins was wanting Ms. Barrett to fail her assignments so he would have grounds to fire her."

(Doc. 48-4, p. 3-4).

other than Chad Higgins was in 2017.

On October 15, 2018, Barrett filed her Charge of Discrimination with the EEOC alleging the latest any discrimination took place was February 23, 2018. Specifically, Barrett's Charge states:

I.   I was hired by the above[-]named Respondent as a Helper on February 22, 2008. My most recent position is Heat Treat Technician, my most recent pay is $27.31, and my direct supervisor is Mr. Chad Higgins, Heat Treat Operations Manager. Since Mr. Higgins has become my supervisor, he has told co-workers to make sure I didn't "sit on" my butt while working and that he hated me. In September 2017, I reported Mr. Higgins conduct to Mr. Jeff Gaines, former Branch Manager. On or about January 17, 2018, I turned in my two-week notice. On or about January 27, 2018, I was approved for medical leave.

II.  On or about January 18, 2018, Mr. Joe Bowers, Vice President, informed me he was not accepting my two-week notice as he wanted to fix things.

III. I believe I have been discriminated against because of my sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Doc. 40-4).

Over two years later, Sean Copeland, the new TEAM Operations Manager, took over Higgins's role. Mr. Copeland texted Barrett and asked her if she wanted to work. Barrett did not respond to the text message from Mr. Copeland on the advice of her attorney, Greg Roosevelt. TEAM terminated Barrett's employment on February 19, 2021. At the time of her termination, there were a total of twelve female technicians working for TEAM at the Wood River district. Three of the females were in the Heat Treat field.

Barrett also testified that Higgins once told her husband that he did not deserve the operations manager position and that he was a "piece of shit." (Doc. 40-2, p. 42; Doc. 48-1, p. 66). Similarly, Barrett testified that another employee, Roger Ivy, experienced similar

conduct from Higgins. (Doc. 40-2, p. 91-92; Doc. 48-2, p. 179-180)

On September 27, 2022, the EEOC issued Barrett a Conciliation Failure and Notice of Right to Sue as to her EEOC charge finding reasonable cause to believe that violations occurred but declining to bring suit.[7] (Doc. 1-1, p. 1). Thereafter, on October 21, 2022, Barrett filed this lawsuit. (Doc. 1).

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 323). This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). *See also Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009) (stating that "we are not required to draw every conceivable

---

[7]     The EEOC findings are not dispositive on whether a civil rights violation occurred. *See, e.g., Newell v. Micro Center Sales Group*, No. 02 C 2104, 2003 WL 1860272, at *4 (N.D. Ill. April 8, 2003) (stating that "[t]he investigator concluded from his investigation that there was substantial evidence of a violation but the Court does not have to accept what amount to his legal conclusions."); *Rector v. Steckenrider, et al.*, Case No. 14-CV-878-NJR-RJD, 2017 WL 1397693, at *3 n.2 (S.D. Ill. April 19, 2017) (noting that administrative findings "are not dispositive on whether a civil rights violation occurred.").

inference from the record . . . we draw only reasonable inferences") (internal citations omitted). Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of her claim. *See Celotex*, 477 U.S. at 322. While the Court may not "weigh evidence or engage in fact-finding[,]" it must determine if a genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in her pleadings; rather, she must show through specific evidence that an issue of fact remains on matters for which she bears the burden of proof at trial. *See Walker v. Shansky*, 28 F.3d 666, 670–671 (7th Cir. 1994) (citing *Celotex*, 477 U.S. at 324). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party . . . if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–250 (citations omitted). *Accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). In other words, "inferences relying on mere speculation or conjecture will not suffice." *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009) (internal citation omitted). *See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]"). Instead, the non-moving party must present "definite, competent evidence to rebut the [summary judgment] motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (internal citation omitted).

Finally, at the summary judgment stage it is not the Court's role to "sift through the

evidence, pondering the nuances and inconsistencies, and decide whom to believe." *D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015) (citing *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). *See also Boss v. Castro*, 816 F.3d 910, 914 (7th Cir. 2016) (noting that courts are not required to scour the record looking for factual disputes or piece together appropriate arguments). Instead, the Court "is only tasked with deciding whether, based on the evidence of the record, there is any material dispute of fact that requires a trial." *Buell*, 796 F.3d at 756.

## DISCUSSION

Title VII prohibits employment discrimination based on sex. It is unlawful "for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). The prohibition on sex discrimination includes sexual harassment that creates a hostile work environment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). A Title VII hostile work environment claim can be brought to remedy conduct that has "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor*, 477 U.S. at 65. The statute also forbids employers from retaliating against employees for complaining about prohibited discrimination. *See Boss*, 816 F.3d at 916.

To prevail in a sexual harassment claim under Title VII, a plaintiff must prove "(1) her work environment was objectively and subjectively offensive, (2) the harassment she

complained of was based on her gender, (3) the conduct was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment, and (4) there is a basis for employer liability." *Swyear v. Fare Foods Corporation*, 911 F.3d 874, 880 (7th Cir. 2018); *accord Passananti v. Cook County*, 689 F.3d 655, 664 (7th Cir. 2012). S*ee also King v. Board of Regents of University of Wisconsin System*, 898 F.2d 533, 537-538 (7th Cir. 1990) (noting that a Section 1983 equal protection violation based on sexual harassment generally "follows the contours of Title VII claims[]").

A work environment "is hostile under Title VII when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Scaife v. United States Department of Veterans Affairs*, 49 F.4th 1109, 1115 (7th Cir. 2022) (quotations and citation omitted). To determine whether harassment meets this "severe or pervasive" bar, a court assesses the totality of the circumstances. *Id.* at 1116. The determination depends on the "severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Johnson v. Advocate Health & Hospitals Corporation*, 892 F.3d 887, 900 (7th Cir. 2018) (quoting *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009)).

Generally, inappropriate physical touching is considered more severe than mere verbal behavior, but in this case, there was no touching. Nevertheless, purely oral harassment, when pervasive, can be actionable. *See, e.g.*, *Passananti*, 689 F.3d at 669 (involving repeated and demeaning use of the word "bitch" paired with false

accusations of misconduct and collecting other examples of actionable orally harassing environments); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007) (stating that "[a] jury reasonably could conclude [that] at least eighteen sexist or sexual comments in less than a year's time and . . . similar comments . . . made 'very often,' . . . w[ere] pervasive enough to create a hostile work environment.").

On the other hand, in cases where there is no touching or relatively limited touching, an objectively hostile working environment is not established. *See, e.g., Swyear*, 911 F.3d at 881-882 (consisting of vulgar nicknames not directed toward the plaintiff, occasional discussions of a co-worker's romantic life, one instance of offensive sexual advances involving minor touching, but no threats or humiliation); *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 686 (7th Cir. 2010) (involving only verbal harassment) (citing *Baskerville v. Culligan International Co.*, 50 F.3d 428, 431 (7th Cir. 1995); *Saxton v. American Telephone & Telegraph Co.*, 10 F.3d 526, 534 (7th Cir. 1993) (consisting of one occasion of touching and rubbing plaintiff's leg, one instance of kissing for several seconds, and one instance of "lurching" at her as if to grab her); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-362 (7th Cir. 1998) (involving "teasing about waving at squad cars [like a prostitute might], ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks"). In these cases, courts have expected employees to be "generally mature individuals with the thick skin that comes from living in the modern world." *Swyear*, 911 F.3d at 881.

As to Barrett's sexual harassment claim, Defendant argues it is entitled to summary

judgment as she cannot demonstrate she was harassed because of her sex or that the complained-of conduct was severe or pervasive. Barrett counters that her "cause of action is for sexual harassment which became so severe and pervasive that it altered the conditions of [her] work and drove [her] off the job because of the emotional upset, anxiety, pain and suffering she experienced." (Doc. 48, p. 1). Further, Barrett contends that she "is making no claim of sexual discrimination other than or in addition to her claim for sexual harassment." *Id*. Barrett argues that she was subjected to unwanted harassment based on her sex and that the Defendant's conduct amounted to a hostile work environment. The Court agrees with Defendants.

First, based on the totality of the circumstances, Barrett has not demonstrated sexual harassment, or an objectively hostile work environment based on her gender. *See, e.g., Whittaker v. Northern Illinois University*, 424 F.3d 640, 645 (7th Cir. 2005) (noting that there was no hostile work environment where comments made outside of plaintiff's presence); *Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998) (same); *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997) (indicating that inappropriate comments not directed at a plaintiff personally have far less impact), abrogation on other grounds recognized by *Jackson v. Illinois Department of Commerce and Economic Opportunity*, No. 21-1168, 2022 WL 3009598, at *6 (7th Cir. July 29, 2022). "Where male and female employees are both exposed to a colleague's conduct, or 'where the conduct complained of is equally offensive to male and female workers,' sexual harassment is not based on gender 'because men and women are accorded like treatment . . . .'" *Chaparro v. City of Chicago*, 47 F.Supp.3d 767, 775 (N.D. Ill. 2014) (quoting *Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir.

2000) (holding that Title VII does not provide a remedy when both sexes are treated badly

because Title VII is predicated on discrimination)).

Clearly, Higgins's conduct was vulgar, disrespectful, and inappropriate. However,

the record does not reveal that this conduct was based on Barrett's gender or based on a

specific gender. In fact, Barrett testified that Higgins called her husband a "piece of shit"

and that he did not deserve the operations manager position. (Doc. 40-2, p. 42; Doc. 48-2, p.

66).[8] Also, Barrett testified that Higgins tried to rally the Wood River facility against both

her and her husband upon their return to that facility. (Doc. 40-2, p. 18; Doc. 48-1, p. 36).

Further, Barrett testified that another employee, Roger Ivy, who was also under Higgins's

supervision, was subjected to similar disparaging comments by Higgins.[9] (Doc. 40-2, p. 91-

---

[8]      Specifically, Barrett testified:
Q. Did Chad do or say anything to make you think that maybe he disliked your husband?
A. Well, he didn't like either of us, but yes.
Q. But that's -- okay. So that's my question.
A. Yes. He -- he had once told my husband that he didn't deserve to have the operations
manager position and that he was a piece of shit.

(Doc. 40-2, p. 42; Doc. 48-1, p. 66).

[9]      As to Mr. Ivy, Barrett testified to the following:
Q. All right. So you know if there were other males who were treated similarly to how you
were treated?
A. I've been -- I've been told so. But I can't -- I don't know -- I can't give you a fact. But I
have been told that there were other males that were treated like that. Roger Ivy is one of them. He
no longer works there. I don't know where he works, and I don't know how to get ahold of him.
Q. All right.
A. I tried to. But they did kind of the same thing to him too.
Q. To Roger?
A. Yes.
Q. And who told you about that, Roger?
A. Roger.
Q. Did you see any other males?
A. No.
Q. And sorry. Let me back up. Did -- did Roger work in the same group as you?

92; Doc. 48-2, p. 179-180). Moreover, Barrett testified that Higgins took her off jobs because of the voicemail she left him, that Higgins wanted her gone, and that things got worse after the butt dial. (Doc. 40-2, p. 17-18; Doc. 48-1, p. 35-36). Therefore, the Court finds that Barrett cannot establish that she was discriminated against because of her gender. The failure to establish this prong precludes Barrett from establishing her claim. Despite this failure, however, the Court will proceed to address the "severe or pervasive" prong.

Even construing the facts in Barrett's favor and based on the totality of the circumstances, the Court finds that Barrett's hostile work environment claim also fails because the conduct/comments are not sufficiently severe or pervasive to "rise to the level of an actionable hostile work environment. Higgins's actions, even when viewed together, do not amount to a hostile work environment. While Higgins comments/conduct may have been subjectively offensive to Barrett, they were not objectively offensive, and there is no evidence (aside from Barrett's own speculation in her deposition and in her affidavit) that the comments/conduct were tied to her gender. Higgins other alleged slights against Barrett (assigning her inexperienced help, giving her harder work assignments, taking her off turnaround jobs, monitoring and criticizing her work, and so on), while numerous, were not severe or pervasive. *See, e.g., Abrego v. Wilkie*, 907 F.3d 1004, 1015-16 (7th Cir. 2018) (affirming summary judgment on hostile work environment claim where supervisors were

---

A. He did. And he was our only African American that worked with us.
Q. All right. And so was Chad also his supervisor.
A. Yes.

(Doc. 40-2, p. 91-92; Doc. 48-1, p. 179-180).

allegedly short tempered, unfairly critical, and disrespectful, and subjected employee to "excessive monitoring"). In sum, Barrett has not established that Higgins made her workplace objectively offensive with conduct that was pervasive or severe, and she has not presented sufficient evidence that would permit a reasonable jury to find that the harassment was due to her gender.

For example, in *Dey v. Colt Constr. & Development Co.*, 28 F.3d 1446, 1456 (7th Cir. 1994), the Seventh Circuit found an actionable sexual harassment case involving "almost daily comments" from her supervisor including remarks that he "would eat plaintiff no matter how she smelled" and an incident in the elevator where they were alone, and the supervisor unzipped his pants. Clearly, the case at bar does not contain such extreme and severe conduct as the supervisor's conduct in *Dey*.

Similarly, the Seventh Circuit found actionable sexual harassment in *Boumehdi v. Plastag Holdings*, 489 F.3d 781, 789 (7th Cir. 2007). In that case, at least eighteen sexual comments were directed at plaintiff which included being told to wear low cut blouses, being told when she was bending over to remain in that "perfect" position and asking after a miscarriage what business she had getting pregnant. Again, the severe conduct found to be actionable by the Seventh Circuit in *Boumehdi* is not present here. The Seventh Circuit recognized that Title VII sets a high bar: "[t]he workplace that is actionable is the one that is hellish." *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir 2013) (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)). Under the relevant Seventh Circuit case law and the facts in the record, a reasonable jury could not find that Barrett was subjected to

sexual harassment or a hostile work environment because of her gender.

### CONCLUSION

For the above-stated reasons, the undersigned **GRANTS** Defendant's motion for summary judgment. (Doc. 39).  The Court **FINDS** in favor of Defendant TEAM Industrial Services, Inc., and against Plaintiff Stacy Barrett. Further, the Court **DIRECTS** the Clerk of the Court to enter judgment in favor of TEAM Industrial Services, Inc., and against Plaintiff Stacy Barrett and close the case.

**IT IS SO ORDERED.**

**DATED: August 20, 2024.**

Digitally signed by
Judge Sison
Date: 2024.08.20
14:32:25 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**